UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #:_____               │
│ DATE FILED:  3/27/2025               │
└─────────────────────────────────────┘
```

---

STONELINE GROUP, LLC

                    Plaintiff,

          -against-

LIBERTY MUTUAL INSURANCE COMPANY,

                    Defendant.

---

1:23-cv-8115-MKV

OPINION AND ORDER
DENYING IN PART
AND GRATING IN PART
MOTION FOR
SUMMARY JUDGMENT

MARY KAY VYSKOCIL, United States District Judge:

Plaintiff Stoneline Group, LLC ("Stoneline") filed this action, pursuant to the Court's admiralty jurisdiction, against Defendant Liberty Mutual Insurance Company ("Liberty") for breach of a marine cargo insurance policy [ECF Nos. 1, 12].[1]  Liberty moves for summary judgment [ECF No. 35].  For the reasons set forth below, the motion for summary judgment is DENIED in part and GRANTED in part.

## I.    BACKGROUND

### A.  Facts[2]

#### 1.  Stoneline and the Cargo

Plaintiff Stoneline Group, LLC ("Stoneline") imports natural stone from other countries, including Turkey, into the United States.  *See* Def. 56.1 ¶ 4; Pl. Counter 56.1 ¶ 4.  In the summer of 2022, Stoneline purchased 4,183 crates of natural stone (the "Cargo") for $1,806,281.33, exclusive of shipping and insurance costs, from another company called Yaman Maden.  Def. 56.1

---

[1] "It is well established that cases involving marine cargo insurance policies fall within the federal court's admiralty jurisdiction." *Advani Enterprises, Inc. v. Underwriters at Lloyds*, 140 F.3d 157, 161 (2d Cir. 1998).

[2] The facts are taken from the voluminous evidence cited in the parties' Local Civil Rule 56.1 Statements, including the affidavits and declarations submitted in connection with the motion for summary judgment and the exhibits attached thereto [ECF Nos. 37 ("Def. 56.1"), 38 ("Nicoletti Decl."), 38-6 ("Dilmen Tr."), 38-8 ("Policy"), 38-9 ("Policy Decls."), 38-14 ("Yaman Maden Invoice"), 40 ("Bonuzzi Decl."), 41 ("Pl. Counter 56.1"), 42 ("Reply"), 43 ("Travers Decl."), 44 ("Def. Counter 56.1")].  The facts are undisputed unless the Court indicates otherwise.

¶ 51; Pl. Counter 56.1 ¶ 51.  Yaman Maden ordered the natural stone from a number of different manufacturers located throughout Turkey and arranged for its delivery to the port in Turkey, for shipment to the United States, at which point Stoneline would assume the risk of loss or damage. Def. 56.1 ¶ 65; Pl. Counter 56.1 ¶¶ 65, 192; Def. Counter 56.1 ¶ 192; Yaman Maden Invoice at 2, 4 ("F.O.B" at "PORT" in Turkey).

### 2. The Policy

Stoneline purchased from Defendant Liberty Mutual Insurance Company ("Liberty") a marine cargo insurance policy (the "Policy").  Def. 56.1 ¶ 14; Pl. Counter 56.1 ¶ 14; *see* Policy. The effective date of the Policy was August 15, 2022.  Def. 56.1 ¶ 14; Pl. Counter 56.1 ¶ 14; Policy Decls. § 2.  The coverage "attach[es] on all shipments of goods insured made during the period" of August 15, 2022 to August 15, 2023 (the "Policy Period").  Policy § 4; Policy Decls. § 2.

"The goods insured . . . are all shipments of lawful goods and/or merchandise properly packaged for transportation."  Policy § 5; Def. 56.1 ¶ 35; Pl. Counter 56.1 ¶ 35.  The Policy does not specify what constitutes proper packaging.  *See* Policy;[3] Policy Decls.  The Policy does not contain any language indicating that cargo must be "containerized."  Pl. Counter 56.1 ¶¶ 209, 210; Def. Counter 56.1 ¶¶ 209, 210.

The Policy provides coverage "[a]gainst all risks of physical loss or damage from any external cause . . . ."  Policy Decls. § 6(a); Def. 56.1 ¶ 33; Pl. Counter 56.1 ¶ 33.  It excludes, however, risks from "capture, seizure, arrest, restraint, detainment, confiscation, preemption, requisition or nationalization, and the consequences thereof . . . whether lawful or otherwise." Policy § 39(a) (the "F.C.&S. (Free of Capture and Seizure) Warranty"); Def. 56.1 ¶¶ 33, 34; Pl.

---

[3] The Policy contains a section entitled "Insufficiency of Packing" which provides only that Liberty "will not assert [the] alleged insufficiency or unsuitability" of packaging as a defense to coverage "where the packing or preparation was carried out by a party other than The Insured and the insufficiency or unsuitability arose entirely without The Insured's knowledge."  Policy § 53.

Counter 56.1 ¶¶ 33, 34.

The Policy contains a Warehouse to Warehouse and Marine Extension Clause, which provides:

> This insurance attaches from the time the insured goods leave the warehouse and/or place named in the policy for the commencement of the transit and continues during the ordinary course of transit, including customary transshipment points, until the goods are delivered to the final warehouse at the destination named in the policy

Policy § 15; Def. 56.1 ¶ 31; Pl. Counter 56.1 ¶ 31.  The Policy does not elsewhere "name[]" a place "for the commencement of the transit."  *Id.*

The Policy provides that the limit of liability for "Ocean Cargo" for "any one vessel" is $2,000,000.  Policy § 6; Policy Decl. § 5; Def. 56.1 ¶ 37; Pl. Counter 56.1 ¶ 37.

The Policy contains a Choice of Law Clause, which provides that the Policy is "governed by the federal maritime common law of the United States or, in the absence of controlling federal maritime common law of the United States, the law of the state of New York, irrespective of any principles of choice of law."  Policy § 69; Def. 56.1 ¶ 38; Pl. Counter 56.1 ¶ 38.

Liberty offers evidence that the application submitted by an insurance broker for Stoneline stated that shipments would be "Containerized" [ECF No. 38-10 ("Broker App.") at 15].  *See* Def. 56.1 ¶ 23.  Stoneline denies that it ever represented to Liberty that all of its shipments would be "containerized."  Pl. Counter 56.1 ¶ 23.  The record reflects that the broker also, at some point, "filled out" a "form" in connection with the "application" stating that shipments would be packed "[i]n crates."  Dilmen Tr. at 94:7–17; Nicoletti Decl., Ex. J at 1.

### 3.  The Trip to Port Everglades and Damage to the Cargo

As noted above, Yaman Maden arranged for the delivery of the natural stone that Stoneline had purchased from various manufacturers to the port in Turkey from which Stoneline would ship the Cargo to the United States.  Def. 56.1 ¶ 65; Pl. Counter 56.1 ¶ 65.  Each manufacturer packaged

and crated its own products, which Yaman Maden inspected prior to delivery to the port.  *See* Def. 56.1 ¶¶ 58, 59; Pl. Counter 56.1 ¶¶ 58, 59.  "The Cargo departed the various manufacturers' factories and/or warehouses throughout Turkey by truck and arrived at the Port of Aliaga, Turkey on various dates between July 28, 2022 and August 5, 2022."  Def. 56.1 ¶ 68; Pl. Counter 56.1 ¶ 68.  Yaman Maden also arranged for the Cargo to be loaded on the vessel that Stoneline chartered, the *M/V Canny Caroline*.  *See* Def. 56.1 ¶ 76; Pl. Counter 56.1 ¶ 76.

Liberty asserts that the *M/V Canny Caroline* "is not . . . capable of carrying sea containers." Def. 56.1 ¶ 73 (citing Nicoletti Decl., Ex. O; Nicoletti Decl., Ex. P).  However, Stoneline denies this assertion, Pl. Counter 56.1 ¶ 73,[4] and the evidence cited by Liberty in its 56.1 Statement does not support the assertion.[5]

The loading was completed on August 19, 2022.  *See* Def. 56.1 ¶ 78; Pl. Counter 56.1 ¶ 78; Nicoletti Decl., Ex. R ("Tally Report").  The Tally Report issued by a Turkish inspection service reflects that "4,183 crates of the Stoneline cargo were loaded aboard the vessel," with 3,485 crates in "hold number 2" and 698 crates in "hold number 4."  Def. 56.1 ¶¶ 77, 79; Pl. Counter 56.1 ¶¶ 77, 79; *see* Tally Report.  The Tally Report does not note any damage to the Cargo.  *See* Tally Report; Pl. Counter 56.1 ¶ 212; Def. Counter 56.1 ¶ 212.  The contemporaneous bill of lading for the shipment states that the Cargo was in "GOOD ORDER AND CONDITION" at the port in

---

[4] Stoneline cites "The Maritime Engineering Reference Book: A Guide to Ship Design, Construction and Operation," which Stoneline calls "Ex:<u>AU</u>."  Pl. 56.1 ¶ 73.  However, there does not appear to be an Exhibit AU in the record before the Court.

[5] Liberty cites Exhibit O to the Nicoletti Declaration, a document entitled "Protocol of Payment" [ECF No. 38-17], which concerns the payment owed by Stoneline to the "owners of the vessel CANNY CAROLINE" and says nothing about whether the vessel is capable of carrying containers.  Liberty also cites Exhibit P to the Nicoletti Declaration, which Liberty describes as "a true and accurate copy of a printout of the vessel characteristics for the *M/V Canny Caroline* obtained from" a certain "website."  Nicoletti Decl. ¶ 19.  The exhibit states that "CANNY CAROLINE . . . is a **General Cargo** [vessel]" and purports to describe other facts about the vessel [ECF No. 38-18 (emphasis in original)].  The exhibit does not say that the *M/V Canny Caroline* is incapable of carrying containers, and Liberty cites no evidence that the description of a ship as "General Cargo" necessarily implies that the ship is incapable of carrying containers.  Moreover, Liberty offers no basis to conclude that the information on the website Liberty used is accurate.

Turkey before the voyage to the United States.  Nicoletti Decl., Ex. Q ("First Bill of Lading"); *see* Pl. Counter 56.1 ¶ 212; Def. Counter 56.1 ¶ 212.

The *M/V Canny Caroline* departed from the port in Turkey on or about August 27, 2022. Def. 56.1 ¶ 84; Pl. Counter 56.1 ¶ 84.  It arrived in the United States at Port Everglades, Florida on or about September 27, 2022.  Def. 56.1 ¶ 85; Pl. Counter 56.1 ¶ 85.  While anchored at Port Everglades, before the Cargo was unloaded, the *M/V Canny Caroline* was caught in the path of Hurricane Ian, which created "heavy weather with very rough seas."  Def. 56.1 ¶ 86; Pl. Counter 56.1 ¶ 86; Nicoletti Decl., Ex. T ("the vessel met high swell, dangerous waves and wind gales, [and] the vessel was rolling and pitching heavily").

When operations to unload the *M/V Canny Caroline* thereafter commenced, on or about October 6, 2022, the Cargo was found to be damaged, and the Cargo was further damaged during the unloading.  *See* Def. 56.1 ¶¶ 88, 90; Pl. Counter 56.1 ¶¶ 88, 90; Nicoletti Decl., Ex. U; *id.*, Ex. V.  The stevedores who unloaded the Cargo in Port Everglades "reported that Hold No. 2," which contained much of the Cargo, "had poor dunnage to support the cargo."  Def. 56.1 ¶ 89; Pl. Counter 56.1 ¶ 89.  The Master of the *M/V Canny Caroline*, however, filed a "Letter of Protest," representing that the Cargo had been "properly stowed before sailing" and that the stevedores had been "negligen[t] and careless" while "unlashing and discharging cargo" from Hold No. 2, which caused damage.  Nicoletti Decl., Ex. V at 3.

The stevedores at Port Everglades initially advised Stoneline that approximately one third of the Cargo was damaged, but later estimated that approximately half the Cargo was damaged. Def. 56.1 ¶¶ 91, 93; Pl. Counter 56.1 ¶¶ 91, 93.

### 4.  The Emergency Action Notification

Thereafter, the United States Department of Agriculture ("USDA") inspected the Cargo and issued an Emergency Action Notification requiring that the entire shipment be "re-exported

or destroyed" because of the presence of live "pests" (*i.e.*, snails). Nicoletti Decl., Ex. Y; Def. 56.1 ¶¶ 99, 100, 101; Pl. Counter 56.1 ¶¶ 99, 100, 101. Stoneline arranged for the Cargo to be reloaded on the *M/V Canny Caroline* and transported to the Dominican Republic for fumigation. *See* Def. 56.1 ¶¶ 105, 106; Pl. Counter 56.1 ¶¶ 105, 106.

### 5. The First Claim for Coverage

In late October of 2022, before the stevedores had begun reloading the Cargo, Stoneline notified Liberty that it was making a claim for coverage. *See* Def. 56.1 ¶ 132; Pl. Counter 56.1 ¶ 132. Liberty disclaimed coverage shortly thereafter. *See* Def. 56.1 ¶ 159; Pl. Counter 56.1 ¶ 159. In particular, Liberty stated that "coverage under the Policy did not attach to the subject shipments of marble because those shipments commenced between July 28 and August 5, 2022, prior to the effective date of the Policy, *i.e.*, August 15, 2022." Def. 56.1 ¶ 159; Pl. Counter 56.1 ¶ 159; Nicoletti Decl., Ex. AG.

### 6. The Reloading

The Master of the *M/V Canny Caroline* reported that he observed the stevedores in Port Everglades improperly handle and further damage the Cargo during the reloading operations. Def. 56.1 ¶¶ 112, 116; *see* Pl. Counter 56.1 ¶¶ 112, 116; Nicoletti Decl., Ex. AA; Nicoletti Decl., Ex. AC. The stevedores blamed "the vessel operator's 'poor planning of the stow'" of the Cargo. Def. 56.1 ¶ 113; *see* Pl. Counter 56.1 ¶ 113; Nicoletti Decl., Ex. AB.

### 7. Damage Assessment in the Dominican Republic

The *M/V Canny Caroline* reached the port of Santo Domingo, Dominican Republic, in November of 2022. Def. 56.1 ¶ 118; Pl. Counter 56.1 ¶ 118. Stoneline submits that more of the Cargo was found to be damaged upon unloading in Santo Domingo. Def. 56.1 ¶ 119; Pl. Counter 56.1 ¶ 119. Stoneline thereafter hired a surveyor to inspect the Cargo, and he documented some of the damage, including damage and prior repairs to the crates, but he found it "difficult to

determine the extent of damage" to the natural stone within the crates.  Def. 56.1 ¶¶ 122, 124; Pl. Counter 56.1 ¶¶ 122, 124; Nicoletti Decl., Ex. W.  Stoneline also had a member of its own team perform a quality control inspection in the Dominican Republic, and Stoneline concluded that the shipment was a total loss.  *See* Def. 56.1 ¶ 126; Pl. Counter 56.1 ¶ 126; Nicoletti Decl., Ex. D ("Yener Tr.") at 85:25–88:9; *id.* at 87:24 ("Marble cannot be fixed").

### 8.  The Second Claim for Coverage

In late November of 2022, Stoneline notified Liberty of a second claim for coverage under the Policy.  Def. 56.1 ¶ 164; Pl. Counter 56.1 ¶ 164.  Liberty responded by reiterating that it had denied the first claim for coverage, demanding "conclusive and unequivocal evidence" that losses had occurred "during transit from Port Everglades to Santo Domingo," and asserting that "Liberty is well within its right to decline coverage for this claim on the ground that the shipment was not containerized."  Nicoletti Decl., Ex AL.

### 9.  The Cancellation of the Policy by Liberty

Shortly thereafter, on December 2, 2022, Liberty issued to Stoneline a notice of cancellation of the Policy.  Pl. Counter 56.1 ¶ 205; Def. Counter 56.1 ¶ 205; Bonuzzi Decl., Ex. AT.  Liberty issued the notice of cancellation eight days after receiving the second claim for coverage and approximately eight months before the contractual expiration date of the Policy.  Pl. Counter 56.1 ¶ 205; Def. Counter 56.1 ¶ 205; Bonuzzi Decl., Ex. AT.  Liberty stated that the reason for the cancellation of the Policy was "claims activity."  Pl. Counter 56.1 ¶ 206; Def. Counter 56.1 ¶ 206; Bonuzzi Decl., Ex. AT.

## B.  Procedural History

Stoneline initiated this action by filing a complaint which it later amended [ECF Nos. 1, 12 ("AC")].  The Amended Complaint asserts one claim for breach of contract and one claim for a declaratory judgment.  AC ¶¶ 73–78.  Liberty answered [ECF No. 19].  The parties thereafter

conducted discovery.

Liberty now moves for summary judgment [ECF Nos. 35, 36 ("Def. Mem."), 37 ("56.1"), 38 ("Nicoletti Decl."), 43, 44]. It volleys a number of arguments that the Policy does not provide coverage for any of the losses Stoneline suffered. *See* Def. Mem. at 1. Liberty also seeks a declaration that any damages are limited to $2 million. *See id*.

Stoneline opposes the motion for summary judgment in most respects [ECF Nos. 39 ("Pl. Opp."), 40 ("Bonuzzi Decl."), 41 ("Counter 56.1")]. It maintains that the "proffered ground for dismissal" of its claims "require a factual [determination] by the Court." Pl. Opp. at 1. However, Stoneline agrees that its claim for a declaratory judgment should be dismissed. *Id.* at 26.

## II.    LEGAL STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a dispute. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Court "must resolve all ambiguities and draw all permissible inferences in favor of the non-moving party." *Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006). If there is any evidence in the record that supports a reasonable inference in favor of the non-moving party, summary judgment is improper. *Brooklyn Ctr. For Indep. of the Disabled v. Metro. Transportation Auth.*, 11 F.4th 55, 64 (2d Cir. 2021).

## III.    ANALYSIS

### A.  The Court Applies New York Law in the Absence of Federal Maritime Law.

The Policy provides, and the parties agree, that the Policy is governed by federal maritime law and, in the absence of controlling federal maritime law, New York law. *See* Policy § 69; Def. 56.1 ¶ 38; Pl. Counter 56.1 ¶ 38; Def. Mem. at 7–10; *see generally* Pl. Opp. (citing cases applying

New York law).  "There is no specific federal rule governing construction of maritime insurance contracts."  *Com. Union Ins. Co. v. Flagship Marine Servs., Inc.*, 190 F.3d 26, 30 (2d Cir. 1999).  Because the arguments Liberty advances in its motion for summary judgment generally are matters of contract interpretation, the Court generally applies New York law.

### A.  Liberty Cannot Obtain Summary Judgment by Pretending the Warehouse to Warehouse *Extension* Clause Is an Exclusion.

Liberty argues that coverage under the marine cargo insurance policy that Liberty sold to Stoneline (*i.e.*, the Policy) did not attach to the Cargo on the effective date of the Policy because the natural stone that Stoneline purchased and, thereafter, shipped by sea to the United States had previously been transported—from various manufacturers, in trucks, overland, within Turkey, to the port from which Stoneline shipped the Cargo—before the effective date of the Policy.  The Court is baffled by that argument.

The effective date of the Policy was August 15, 2022.  Def. 56.1 ¶ 14; Pl. Counter 56.1 ¶ 14; Policy Decls. § 2.  The Policy provides that coverage "attach[es] on all shipments of goods insured made during the [Policy] period."  Policy § 4; Policy Decls. § 2.  The *M/V Canny Caroline* departed from the port in Turkey, with the Cargo on board, during the Policy Period.  *See* Def. 56.1 ¶ 84; Pl. Counter 56.1 ¶ 84.  Nevertheless, Liberty argues that the Policy provides no coverage for any of the losses that Stoneline suffered because "[t]he shipment" of the Cargo had "commenced transit . . . well prior to the Policy's effective date."  Def. Mem. at 12.  Specifically, Liberty takes issue with the fact that "[t]he Cargo departed various manufacturers' factories and/or warehouses throughout Turkey by truck and arrived at the Port [in] Turkey on various dates between July 28, 2022 and August 5, 2022."  Def. Mem. at 14.  Notably, Liberty takes this position even though neither party is arguing that the Cargo was damaged during such transit.  *See* Pl. Counter 56.1 ¶ 212; Def. Counter 56.1 ¶ 212; First Bill of Lading.

To advance its specious argument for disclaiming coverage, Liberty improbably invokes the Warehouse to Warehouse and Marine Extension Clause (the "Extension Clause") of the Policy. Def. Mem. at 13. It is fundamental that an insurance policy must be "construed to effectuate the intent of the parties as derived from the plain meaning of the policy's terms." *Andy Warhol Found. for Visual Arts, Inc. v. Fed. Ins. Co.*, 189 F.3d 208, 215 (2d Cir. 1999); *see World Trade Ctr. Properties, L.L.C. v. Hartford Fire Ins. Co.*, 345 F.3d 154, 184 (2d Cir. 2003); *Universal Am. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 25 N.Y.3d 675, 680, 37 N.E.3d 78, 80 (2015); *Breed v. Ins. Co. of N. America*, 46 N.Y.2d 351, 355, 385 N.E.2d 1280, 1282 (1978); Barry R. Ostrager & Thomas R. Newman, *Handbook on Insurance Coverage Disputes* § 1.01[a] (22nd ed. 2024). As the term makes plain, an extension clause extends coverage, rather than limits it. *See Great N. Ins. Co. v. Mount Vernon Fire Ins. Co.*, 92 N.Y.2d 682, 688*, 708 N.E.2d 167, 171* (1999) ("'Extended Insurance' is a generic term for an endorsement added to an insurance policy or a clause found in an insurance policy that will provide additional coverage for risks to be insured other than those covered under the basic policy provisions") (internal citation omitted); *Pali Fashions, Inc. v. New Hampshire Ins. Co.*, 158 A.D.2d 360, 361, 551 N.Y.S.2d 215 (1st Dep't 1990) (explaining that a "warehouse coverage endorsement extended the [marine cargo insurance] policy" and analyzing the scope of the extended coverage).

Here, the Extension Clause plainly extends the coverage under the Policy to include, in addition to the maritime voyage itself, any "ordinary" transportation "from the time the insured goods leave the warehouse . . . for the commencement of the transit" and from the vessel "to the final warehouse." Policy § 15; Def. 56.1 ¶ 31; Pl. Counter 56.1 ¶ 31. There is no basis in law or reason for the argument that the Extension Clause *excludes* coverage for losses sustained while the goods were aboard the shipping vessel, during the Policy Period, merely because the goods commenced transit to the vessel before the effective date of the policy. As such, Liberty cites only

grossly inapposite cases. *See* Def. Mem. at 13–14.

For example, Liberty cites *Hillcrea Export & Import Co., Inc. v. Universal Insurance Co.*, 110 F. Supp. 204, 206 (S.D.N.Y. 1953), *aff'd sub nom.*, *Hillcrea Exp. & Imp. Co. v. Universal Ins. Co.*, 212 F.2d 206 (2d Cir. 1954). In that case, the district court concluded that "a 'warehouse to warehouse' clause" did not provide coverage when a fire destroyed the building where goods intended for shipment were being stored because, the court found, the goods had not yet "left their place of storage . . . for the commencement of the transit to a final port of destination." *Id.* at 207, 209. That case obviously offers no support for the notion that Liberty is entitled to disclaim all coverage for losses that Stoneline allegedly suffered while the Cargo was on board the *M/V Canny Caroline* (and, thereafter, being unloaded and reloaded).

Liberty also cites *Pali Fashions, Inc. v. New Hampshire Insurance Co.*, 158 A.D.2d at 361, 551 N.Y.S.2d 215, which is similarly inapposite. In that case, the plaintiff had sustained water damage to certain goods in its warehouse. *Id.* The plaintiff sought coverage under a marine cargo policy it had obtained for an unrelated shipment of goods, citing a warehouse to warehouse extension clause. *See id.* The First Department explained that the warehouse extension clause did not extend coverage to an unrelated shipment of goods that predated the marine cargo policy (it was not "a policy simply providing warehouse coverage"). *Id.* This case provides no support for the notion that, if a marine cargo insurance policy contains a warehouse to warehouse extension clause, the insured loses all coverage for goods it ships by sea during the policy period merely because other entities also transported the goods over land prior to the policy period.

Here, the parties agree that Yamen Maden (not Stoneline) ordered the natural stone that comprised the Cargo from various manufacturers and arranged for those manufacturers to deliver their contributions to the port in Turkey. *See* Def. 56.1 ¶ 65; Pl. Counter 56.1 ¶ 65. At that point, Stoneline would take possession of the Cargo and assume the risk of loss. *See* Yaman Maden

Invoice at 2, 4 ("F.O.B" at "PORT" in Turkey); *Kiobel v. Royal Dutch Petroleum Co.*, No. 02-cv-7618 (KMW), 2010 WL 2507025, at *3 (S.D.N.Y. June 21, 2010). Yet Liberty audaciously insists that Stoneline was required to purchase an insurance policy that went into effect before Stoneline even assumed the risk of any loss. This makes little sense and is inconsistent with the fundamental principle that an insurance policy must be "construed to effectuate the intent of the parties." *Andy Warhol Found. for Visual Arts, Inc.*, 189 F.3d at 215; *Breed v. Ins. Co. of N. America*, 46 N.Y.2d at 355, 385 N.E.2d at 1282.

There is no dispute that the Policy Period began before the Cargo left the port, *see* Def. 56.1 ¶ 84; Pl. Counter 56.1 ¶ 84, and Stoneline does not seek coverage for any alleged losses before the Cargo left the port. On the contrary, Stoneline stresses that the Cargo was undamaged, in good order and condition, before the *M/V Canny Caroline* set sail. *See* Pl. Opp. at 19; Nicoletti Decl., Ex. Q; *see* Pl. Counter 56.1 ¶ 212; Def. Counter 56.1 ¶ 212. Liberty appears to take the position that coverage under the Policy attaches only to goods that spring into existence—or, at minimum, leave the factory for the first time—during the Policy Period. *See* Def. Mem. at 14. However, the Policy provides that coverage attaches to "all *shipments* . . . during the [Policy] period." Policy § 4 (emphasis added); *see* Policy Decls. § 2.

Liberty cannot disclaim all coverage by pretending that the Extension Clause is, instead, an exclusion. *See Great N. Ins. Co.*, 92 N.Y.2d at 688*, 708 N.E.2d at 171*. Even if Liberty could plausibly argue that the Extension Clause operates as an exclusion, Liberty would have the burden to show that the exclusion applies, which Liberty cannot do. *See Breed*, 46 N.Y.2d at 353, 385 N.E.2d at 1282. As such, Liberty is not entitled to summary judgment against its insured on the ground that various manufacturers transported parts of the Cargo by truck within Turkey before the Policy Period.

**B.  The Cargo Was Physically Damaged.**

Liberty next erects an obvious strawman argument that the "live pests" (*i.e.* snails) found at Port Everglades did not cause "physical loss or damage" to the Cargo within the meaning of the Policy.  Def. Mem. at 17.  As stated above, the Policy provides coverage "[a]gainst all risks of physical loss or damage from any external cause . . . ."  Policy Decls. § 6(a); Def. 56.1 ¶ 33; Pl. Counter 56.1 ¶ 33.  Liberty stresses that physical loss or damage "has a precise meaning under New York law," which requires tangible change to property, and Liberty contends that there is no evidence that the snails caused such damage.  Def. Mem. at 15, 17.

There is no question that New York courts interpret the language in the Policy to require tangible, physical damage to the insured's property.  *See Consol. Rest. Operations, Inc. v. Westport Ins. Corp.*, 41 N.Y.3d 415, 426, 235 N.E.3d 332, 336 (2024).  Here, however, there is no dispute that the Cargo sustained major, tangible, physical damage.  *See* Def. 56.1 ¶¶ 88, 90; Pl. Counter 56.1 ¶¶ 88, 90; Nicoletti Decl., Ex. U; *id.*, Ex. V.  Liberty itself submits evidence that "20 pallets" of natural stone were reduced to "debris."  Nicoletti Decl., Ex. W.

To prevail on its motion for summary judgment, Liberty must offer evidence that there is "no genuine dispute as to any material fact" *and* Liberty "is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Instead, Liberty offers a red-herring about snails.  *See* Def. Mem. at 17.  Even if the Court were to agree that there is no evidence the snails caused tangible physical damage to the Cargo, the Court would have no basis to conclude that Liberty is, therefore, entitled

13

to judgment as a matter of law that it did not breach the Policy.[6]

### C. There Are Disputes of Fact About Whether the Cargo Was Properly Packaged.

Liberty argues that the Policy provides no coverage "due to the insufficient packaging" of the Cargo. Def. Mem. at 22. As explained above, the Policy defines the "goods insured" as "lawful goods and/or merchandise properly packaged for transportation." Policy § 5; Def. 56.1 ¶ 35; Pl. Counter 56.1 ¶ 35. However, the Policy does not specify any requirements for proper packaging. *See* Pl. Counter 56.1 ¶¶ 209, 210; Def. Counter 56.1 ¶¶ 209, 210. If an insurer leaves a policy term indefinite, "it will generally be construed against the insurer who drafted it in order to promote coverage for losses to which the policy relates." *Ingersoll Mill. Mach. Co. v. M/V Bodena*, 829 F.2d 293, 306 (2d Cir. 1987) ("This principle applies to . . . maritime policies); *see Handelsman v. Sea Ins. Co.*, 85 N.Y.2d 96, 101, 647 N.E.2d 1258, 1260 (1994).

Liberty baldly asserts that there is no coverage under the Policy because "Stoneline knew" the *M/V Canny Caroline* "was not capable of carrying containers." Def. Mem. at 21. Liberty fails to cite any admissible evidence that the *M/V Canny Caroline* was incapable of carrying containers. *See supra* n.5. Moreover, while evidence in the record suggests the Cargo was loaded on the *M/V Canny Caroline* in crates (which crates were not, in turn, packed in containers), Liberty never even directly asserts in its 56.1 Statement that, in fact, the Cargo was not packed in containers, let alone "cit[e] to particular parts of materials in the record" supporting it assertion, as required by Rule 56 of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 56(c)(1).

---

[6] At the beginning of its brief, Liberty attempts to cast the argument discussed above as a request for "dismissal of Stoneline's *claims* relating to losses other than those caused by physical loss or damage to the subject cargo." Def. Mem. at 1 (emphasis added). In this action, however, Stoneline asserts only two claims: a claim for breach of contract and a claim for a declaratory judgment (the latter of which Stoneline agrees should be dismissed, *see* Pl. Opp. at 26). Liberty fails to show that it is entitled to summary judgment on the breach of contract claim. Its various arguments that particular damages are not recoverable under the Policy, *see* Def. Mem. at 18, 22–24, are all either damages that Stoneline expressly represents it does not seek, or fact-based arguments not susceptible of resolution on a motion for summary judgment. Liberty is free to renew these arguments at trial.

In any event, as Liberty admits, the Policy does not contain any language requiring the Cargo to be packaged in containers. *See* Pl. Counter 56.1 ¶¶ 209, 210; Def. Counter 56.1 ¶¶ 209, 210. In its moving brief, Liberty utterly fails to explain, let alone support with evidence and authority, its inchoate theory that the Cargo was required to be containerized in order to be "properly packaged" under the Policy. Policy § 5; *see* Def. Mem. at 21–21. As such, Liberty failed to "show[] that there is no genuine dispute as to any material fact and [Liberty] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Liberty filed with its reply brief a report from a purported expert opining that the Cargo was not properly packaged [ECF No. 43]. However, it is well-established that "arguments not made in an . . . opening brief are waived." *JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418, 428 (2d Cir. 2005). The reason for that well-established rule is manifest here, since Stoneline has had no opportunity to challenge the purported expert or to offer its own expert evidence to the contrary.

In any event, there is clearly a dispute of fact whether the Cargo was properly packaged as that term is ordinarily understood. Stoneline offers evidence that the packaging of the Cargo was "standard" in its experience with exporting natural stone from Turkey. Yener Tr. at 97:14. Liberty itself filed evidence from the Master of the *M/V Canny Caroline* representing that the Cargo had been "properly stowed." Nicoletti Decl., Ex. V at 3. Thus, Liberty has failed to carry its initial burden to demonstrate the absence of any material dispute of fact. *See Celotex Corp.*, 477 U.S. at 323. Indeed, by belatedly proposing to offer expert opinion on this issue, Liberty only underscored the existence of a material dispute of fact.

Liberty, therefore, has failed to properly raise any argument for summary judgment on the ground that the Cargo was not properly packaged. Liberty emphatically has not properly raised an argument that the Policy was void *ab initio* because Stoneline had purportedly made material

misrepresentations on the application for the Policy. *See Ingersoll Mill. Mach. Co.*, 829 F.2d at 308 ("The doctrine of *uberrimae fidei* requires a party seeking marine insurance to disclose all circumstances known to it which materially affect the risk," and "[i]f a party omits to disclose material information applicable to the risk involved, the policy is void."). In any event, the Court concludes that if Liberty had properly raised such an argument, disputes of fact would preclude granting summary judgment for Liberty.

Liberty offers evidence that the application submitted by the insurance broker for Stoneline stated that shipments would be "[c]ontainerized." Broker App. at 15. However, Stoneline denies that it ever represented that all of its shipments would be "containerized." Pl. Counter 56.1 ¶ 23. Crucially, evidence in the record reflects that the broker also represented, at some point, in connection with the application, that shipments would be packed "[i]n crates." Dilmen Tr. at 94:7–17; Nicoletti Decl., Ex. J at 1. As such, there is evidence in the record that supports a reasonable inference in favor of Stoneline, and summary judgment is improper. *See Brooklyn Ctr. For Indep. of the Disabled*, 11 F.4th at 64.

### D. Liberty Is Not Entitled to Summary Judgment Based on the F.C.&S. Warranty.

Liberty next argues that "there is no coverage for any costs [Stoneline] incurred as a result of the USDA Order" requiring Stoneline to destroy or re-export the Cargo. Def. Mem. at 19. The Policy expressly does not provide insurance for "capture, seizure, arrest, restraint, detainment, confiscation, preemption, requisition or nationalization, and the consequences thereof . . . whether lawful or otherwise." Policy § 39(a) (the "F.C.&S. Warranty"); Def. 56.1 ¶¶ 33, 34; Pl. Counter 56.1 ¶¶ 33, 34. Liberty argues that the Emergency Action Notification, Nicoletti Decl., Ex. Y, was an "order restraining" the Cargo, and, therefore, the F.C.&S. Warranty excludes coverage for any losses "incurred as a result" of that order. Def. Mem. at 20.

Liberty relies on *Blaine Richards & Co., Inc. v. Marine Indemnity Insurance Company of*

*America*, 635 F.2d 1051 (2d Cir. 1980) ("*Blaine*"). In that case, the Food and Drug Administration ("FDA") "*detained* upon arrival in this country" a shipment of beans from Europe, and the plaintiff lost sales contracts and spent money making the shipment conform to FDA demands. *See id.* at 1052 (emphasis added). The plaintiff sought coverage under a marine insurance policy that contained "a standard Free from Capture and Seizure . . . Clause" similar to the F.C.&S. Warranty here. *Id.* The Second Circuit held that "held that detention by the FDA falls within the exemption[.]" *Id.* at 1054. However, the Second Circuit reversed the district court's decision to grant summary judgment and remanded for further proceedings to determine whether the detention was the "proximate cause" of all the losses alleged. *Id.* at 1055.

As an initial matter, unlike the beans in *Blaine*, the Cargo was not "detained." *Id.* at 1052. The Emergency Action Notification, which required Stoneline to destroy or re-export the Cargo, does not fall as neatly within the terms "capture, seizure, arrest, restraint, detainment, confiscation, preemption, requisition or nationalization." Policy § 39(a). All of those terms imply an effort to "hold" the goods in question, *Blaine*, 635 F.2d at 1053, in contrast with the order to re-export or destroy the Cargo.

In any event, assuming that the Emergency Action Notification does fall within the F.C.&S. Warranty, there is, at minimum, a dispute of fact whether the Emergency Action Notification was the proximate cause of the subsequent losses for which Stoneline seeks coverage. *See id.* at 1055. Stoneline represents in its opposition brief that it "is not seeking damages caused by delays and cancellation of contract, but rather . . . for physical loss of cargo" in connection with the trip "from the United States to the Dominican Republic." Pl. Opp. at 21.[7]

In response to the Emergency Action Notification, Stoneline arranged for the Cargo to be

---

[7] As Stoneline stresses in its brief, Stoneline also seeks "damages for physical loss of cargo incurred during the ocean transportation from Turkey to the United States" and "caused by the mishandling of the cargo during discharge" at

reloaded on the *M/V Canny Caroline* and transported to the Dominican Republic for fumigation. *See* Def. 56.1 ¶¶ 105, 106; Pl. Counter 56.1 ¶¶ 105, 106. There is evidence in the record that the stevedores in Port Everglades mishandled and further damaged the Cargo during the reloading. *See* Nicoletti Decl., Ex. AA; Nicoletti Decl., Ex. AC. Under *Blaine*, Stoneline could seek coverage for such physical loss or damage, Policy Decls. § 6(a), on the ground that the Emergency Action Notification was not the proximate cause, *Blaine*, 635 F.2d at 1055. Accordingly, Liberty is not entitled to summary judgment based on the F.C.&S. Warranty.

### E.  The Limit of Liability Is a Question of Fact for the Jury.

Liberty requests "[p]artial summary judgment declaring that the maximum potential recoverable damages is $2 million due to the applicable limit of liability under the Policy for 'any one vessel.'" Def. Mem. at 1; *see id.* at 24–25. Stoneline argues that the *M/V Canny Caroline* was, in effect, one vessel for the trip from Turkey to Port Everglades and one vessel for the trip to the Dominican Republic. Pl. Opp. at 25.

 The Policy provides that Liberty "shall not be liable under this policy for more than" $2,000,000 for "any one vessel, connecting conveyance, or in any one place at any one time." Policy § 6; Policy Decl. § 5 ("Any one Vessel: $2,000,000"). Stoneline contends that this language is ambiguous enough to permit Stoneline to argue to a jury that the *M/V Canny Caroline* was not "one vessel" on the facts of this case. Indeed, Stoneline cites the evidence that there were separate bills of lading for the two voyages. *See* Nicoletti Decl., Ex. Q ("First Bill of Lading"); Nicoletti Decl., Ex. AC ("Second Bill of Lading"). If Stoneline had planned in advance to charter the same

---

Port Everglades, all of which occurred before the Emergency Action Notification issued. Pl. Opp. at 21. Liberty argues only that "there is no coverage for any costs incurred *as a result of*" the Emergency Action Notification, Def. Mem. at 19 (emphasis added), which the Court takes as a concession that its argument about the F.C.&S. Warranty has no bearing on its potential liability for damage sustained before the Emergency Action Notification issued.

vessel for two trips months apart within the Policy Period, it would not be considered "one vessel" for purposes of the liability limit.

Liberty cites only one, inapposite case in support of its request for summary judgment on the limit of its liability under the Policy. *See* Def. Mem. at 24–25. Specifically, Liberty stresses that in *Protection Mutual Insurance Co. v. Silgan Plastics Corp.*, No. 96-cv-4493 (NRB), 2000 WL 1170132 (S.D.N.Y. Aug. 17, 2000), the district court interpreted similar language to establish a "$500,000 *per shipment* limit." Def. Mem. at 25 (emphasis in brief) (quoting 2000 WL 1170132, at *6). However, in that case, the district court was issuing findings of fact and conclusions of law after a bench trial. Moreover, here, Stoneline essentially argues that there were two shipments, so the language in *Silgan Plastics* offers no guidance.

The law governing both summary judgment and the interpretation of the Policy require the Court resolve all ambiguities in favor of Stoneline. *See Jaegly*, 439 F.3d at 151; *Breed*, 46 N.Y.2d at 353, 385 N.E.2d at 1282. As such, the Court concludes that a jury must decide whether this case involves only "one vessel" for purposes of the limit of liability under the Policy. *See World Trade Ctr. Properties, L.L.C.*, 345 F.3d at 189.

### F. The Court Dismisses the Claim for a Declaratory Judgment.

Liberty argues that the claim Stoneline asserts for a declaratory judgment is duplicative of its claim for breach of contract and should be dismissed as a matter of law. *See* Def. Mem. at 25. Stoneline "concedes" that the claim should be dismissed. Pl. Opp. at 26. The Court agrees with the parties. A declaratory judgment is a remedy. In determining whether to award relief under the Declaratory Judgment Act, a district court should consider: "(1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty." *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 389 (2d Cir. 2005). "Courts generally reject a DJA claim

when other claims in the suit will resolve the same issues." *EFG Bank AG, Cayman Branch v. AXA Equitable Life Ins. Co.*, 309 F. Supp. 3d 89, 99 (S.D.N.Y. 2018) (collecting cases).

As both parties agree, here, the DJA claim is wholly duplicative of the breach of contract claim. Def. Mem. at 25; Pl. Opp. at 26. The resolution of the contract claim will settle the issues for which a declaratory judgment is sought. As such, that remedy would not serve any useful purpose in settling the legal issues in this case, finalize the controversy, or offer any relief from uncertainty. *Duane Reade, Inc.*, 411 F.3d at 389. The DJA claim is dismissed.

## IV.     CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment is DENIED as to Plaintiff's claim for breach of contract. The motion is GRANTED as to the claim for a declaratory judgment. The Clerk of Court respectfully is requested to terminate the motion pending at docket entry 35. The Court will separately issue an order scheduling a jury trial.

**SO ORDERED.**

**Date:  March 27, 2025**
**New York, NY**

**MARY KAY VYSKOCIL**
**United States District Judge**